UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

v.

ALEXANDRIA DAVALL,

Defendant.

Docket No.: 3:14cr00097

**DEFENDANT'S SENTENCING MEMORANDUM**

---

The Defendant, Alexandria Davall, by and through her attorney, Jeffrey R. Parry, Esq., hereby submits her Sentencing Memorandum requesting that the Court sentence the defendant to the minimum amount of time required by law.

## I. INTRODUCTION

On, March 13, 2014, the Defendant, Alexandria Davall, entered a plea of guilty to a single count Information alleging her violation of 18 U.S.C. § 1591 - Sex Trafficking of Children by Force, Fraud, or Coercion. Ms. Davall entered her plea freely and candidly. She is scheduled to be sentenced on February 20, 2015.

## II. COMMENTS UPON THE PRESENTENCE REPORT

It should be noted that, while the defendant is in general agreement with the facts of this case as they are depicted in the Presentence Report, the defendant specifically objects to the inferences and conclusions drawn from these facts. Toward that end, identified below are aspects of the fact pattern which would cause the Court to reconsider the conclusions contained in the PSR or to deviate from the guideline range in light of the goal of arriving at a sentence that is

1

"sufficient, but not greater than necessary" to achieve the statutory purposes of punishment as delineated by 18 U.S.C. §3553. For the Court's convenience, those factors recognized under the statute are depicted below.

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—

(i) issued by the Sentencing Commission pursuant to section 994 (a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994 (p) of title 28); and

(ii) that, except as provided in section 3742 (g), are in effect on the date the defendant is sentenced…..

(5) any pertinent policy statement…..

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

Based upon the discretion vested in the District Court as enunciated in

*Booker,* this Court may consider the Sentencing Guidelines along with the

statutory factors above, in drawing its own, independent conclusions. *United States v. Booker,* 125 S. Ct. 738 (2005).

### a. Offense Conduct

Victim "ML", under circumstances which remain unclear, essentially escaped from a juvenile detention facility on or about February 3, 2012. Arriving in Utica, New York, she found herself homeless and without resources. There she met Jakeem Penn, a cab driver with criminal affiliations. Mr. Penn coerced ML to accompany him with promises of help and a safe place to stay. Referring to ML as "fresh meat" in his comments to the conspirators herein, Penn gained ML's trust and brought her to Ms. Davall.

It is conceded that Ms. Davall was a prostitute. It is further conceded that Ms. Davall introduced ML to her trade. However, it is also true that Ms. Davall was far from a willing participant in her profession as she often alluded to the repulsive nature of the business. In fact, the victim described how Ms. Davall would take drugs before "dates" to make the sexual encounters more bearable. Therefore, it is certainly appropriate to recognize that Ms. Davall was selling herself reluctantly to provide for her drug addiction and to keep a very humble roof over her head. During this time she was living entirely at the mercy of Edward Tilden, her pimp, and was required upon penalty of punishment to service the men that he produced and provide him with the proceeds. Her services were not

"optional" in that she was not allowed to refuse. Rather, her participation was insured by the combination of Tilden's threats, his abuse and her own need to provide for her drug addiction. As such, Ms. Davall was clearly exploited and, based upon the coercion and beatings she received from Edward Tilden, should be described as a victimized woman as well.

In fact, the defendant specifically objects to the passage in the PSR which erroneously depicts her as sending texts advertising "fresh meat", "two girl specials" and "1 fresh meat 1 has been doing it for a while". In actuality, these text messages were sent by Edward Tilden only. Exhibit 1. It should be noted that Ms. Davall was the second woman advertised in the above advertisements. In fact, Ms. Davall was required to commit the same disgusting acts that ML engaged in.

Further, while Ms. Davall admits that her providing accommodations for ML must be interpreted as harboring a minor who would, very foreseeably, be drawn into the sex trade, it was also an attempt by Ms. Davall to provide for the needs of a homeless teenager whose circumstances were not far removed from her own. Indeed, while Ms. Davall has admitted to her role in introducing ML to prostitution, she also took steps to protect ML although her ability to do so was severely curtailed by the co-defendants. And while it cannot be said that she was wholly without culpability, there is actual evidence of Ms. Davall's friendship with ML given that, when ML was apprehended and returned to her juvenile facility,

she again escaped and returned to Ms. Davall's apartment. In point of fact, ML

referred to Ms. Davall as a "big sister". Exhibit 1.

### b. Acceptance of Responsibility

While the PSR correctly gives credit to Ms. Davall for acceptance of

responsibility, it is instructive to note that the officer is somewhat in error in her

depiction of the circumstances. In point of fact, Ms. Davall confessed to the

arresting officer, fully and completely, at the very outset of this action. Her

confession was highly detailed and contained, word for word, all of the

information in exactly the same form as that which was offered to the Probation

Officer during the PSR interview. She never once waivered or changed her story in

the slightest through these many months of litigation.

### III. SENTENCING OPTIONS

The defendant acknowledges that she is subject to a minimum term of

imprisonment of 10 years. Further, defendant concedes her base offense level of 30

and that a 2 point increase is appropriate for "unduly influencing" a minor.

§2G1.3(b)(2)(B). Defendant further concedes that the offense involves a

commercial sex act and, consequently, a two point increase is again appropriate.

§2G1.3(b)(4)(A). However, the defendant adamantly maintains that she never

utilized a computer to further the acts depicted herein and was not in a position to

even know that one was being used. §2G1.3(b)(3)(B). As such, the defendant

respectfully maintains that the adjusted offense level should properly be established at **31**.

Thereafter, the defendant specifically objects to the additional 5 points added for a "pattern of activity involving prohibited sexual conduct". §4B1.5(b). Any "repeat" activities alleged herein do not constitute a "pattern of activity" as contemplated under the Guidelines. Rather, the PSR erroneously depicts two separate physical acts relevant to the instant offense as qualifying as a pattern of activity. However, it is defendant's position that the drafters in fact intended the "pattern of activity" to include only previous crimes and convictions. To quote the Guidelines:

> The relevant criminal provisions provide for increased statutory maximum penalties for repeat sex offenders and make those increased statutory maximum penalties available if the defendant previously was convicted of any of several federal and state sex offenses (see 18 U.S.C. §§ 2247, 2426). *See* §4B1.5(b) *Application Notes* at *Background*.

As such, the 5 additional points were erroneously added in the PSR and defendant's offense level should properly be established at **31**. This would properly place the defendant at risk for 121 to 151 months of incarceration.

### a. Mental and Emotional Conditions

This writer has represented Ms. Davall for approximately eighteen months. While I was aware that she had a history of psychological treatment, during that time I witnessed absolutely nothing that would cause me to doubt my client's

competency. She has at all times understood the charges against her, the nature of these proceedings and she has been able to assist me in her defense. As such, I was very surprised when, in December of 2014, she disclosed to me that she was being treated for current psychological symptoms that included hallucinations. Accordingly, I undertook an investigation into her psychological history and her current treatment.

My findings essentially mirrored that found in the PSR in that Ms. Davall has been treated for anxiety, depression, agoraphobia, bipolar disorder, oppositional defiant disorder and borderline personality disorder. Her treatment has taken place through several facilities and includes inpatient care at the former Four Winds Facility near Syracuse. She has been treated with a vast array of medications for all of the above maladies. Of concern is the fact that her treatment extends over more than a decade and continues to the present day.

The Federal Sentencing Guidelines specifically note the importance of the defendant's psychological condition and history in formulating an appropriate sentence. §5H1.3. Clearly therefore, a description of these illnesses is appropriate if the Court is to evaluate their significance.

The National Institute of Mental Health describes Bipolar Disorder as follows:

Bipolar disorder, also known as manic-depressive illness, is a brain
disorder that causes unusual shifts in mood, energy, activity levels,
and the ability to carry out day-to-day tasks. Symptoms of bipolar
disorder are severe. They are different from the normal ups and downs
that everyone goes through from time to time. Bipolar disorder
symptoms can result in damaged relationships, poor job or school
performance, and even suicide. But bipolar disorder can be treated,
and people with this illness can lead full and productive lives.
*See* http://www.nimh.nih.gov/health/topics/bipolar-disorder/index.shtml

In the above noted description, the NIMH notes that Bipolar Disorder can

cause broad mood swings and symptoms typically associated with popular notions

of "manic-depression". The disease may lead to suicide. Most important for our

purposes herein, Bipolar Disorder may lead to psychotic symptoms including

hallucinations. Such breaks with reality would obviously compromise the

defendant's competency if present.

The National Institute of Mental Health describes Borderline Personality

Disorder as follows:

Borderline personality disorder (BPD) is a serious mental illness
marked by unstable moods, behavior, and relationships......

Because some people with severe BPD have brief psychotic episodes,
experts originally thought of this illness as atypical, or borderline,
versions of other mental disorders. While mental health experts now
generally agree that the name "borderline personality disorder" is
misleading, a more accurate term does not exist yet.

Most people who have BPD suffer from:
Problems with regulating emotions and thoughts

8

Impulsive and reckless behavior
Unstable relationships with other people.

People with this disorder also have high rates of co-occurring
disorders, such as depression, anxiety disorders, substance abuse, and
eating disorders, along with self-harm, suicidal behaviors, and
completed suicides.
*See* http://www.nimh.nih.gov/health/topics/borderline-personality-
disorder/index.shtml

The following description of symptoms offered by NIMH may be of great

use to the Court:

According to the DSM, Fourth Edition, Text Revision (DSM-IV-TR),
to be diagnosed with borderline personality disorder, a person must
show an enduring pattern of behavior that includes at least five of the
following symptoms:
Extreme reactions—including panic, depression, rage, or frantic
actions—to abandonment, whether real or perceived
A pattern of intense and stormy relationships with family, friends, and
loved ones, often veering from extreme closeness and love
(idealization) to extreme dislike or anger (devaluation)
Distorted and unstable self-image or sense of self, which can result in
sudden changes in feelings, opinions, values, or plans and goals for
the future (such as school or career choices)
Impulsive and often dangerous behaviors, such as spending sprees,
unsafe sex, substance abuse, reckless driving, and binge eating
Recurring suicidal behaviors or threats or self-harming behavior, such
as cutting
Intense and highly changeable moods, with each episode lasting from
a few hours to a few days
Chronic feelings of emptiness and/or boredom
Inappropriate, intense anger or problems controlling anger
Having stress-related paranoid thoughts or severe dissociative
symptoms, such as feeling cut off from oneself, observing oneself
from outside the body, or losing touch with reality.

Seemingly mundane events may trigger symptoms. For example, people with BPD may feel angry and distressed over minor separations—such as vacations, business trips, or sudden changes of plans—from people to whom they feel close. Studies show that people with this disorder may see anger in an emotionally neutral face and have a stronger reaction to words with negative meanings than people who do not have the disorder.

Suicide and Self-harm

Self-injurious behavior includes suicide and suicide attempts, as well as self-harming behaviors, described below. As many as 80 percent of people with BPD have suicidal behaviors, and about 4 to 9 percent commit suicide.

Suicide is one of the most tragic outcomes of any mental illness. Some treatments can help reduce suicidal behaviors in people with BPD. For example, one study showed that dialectical behavior therapy (DBT) reduced suicide attempts in women by half compared with other types of psychotherapy, or talk therapy. DBT also reduced use of emergency room and inpatient services and retained more participants in therapy, compared to other approaches to treatment.

Unlike suicide attempts, self-harming behaviors do not stem from a desire to die. However, some self-harming behaviors may be life threatening. Self-harming behaviors linked with BPD include cutting, burning, hitting, head banging, hair pulling, and other harmful acts. People with BPD may self-harm to help regulate their emotions, to punish themselves, or to express their pain. They do not always see these behaviors as harmful. *Id.*

Granted that this writer is not competent to advise the Court as to the ramifications of these conditions however, the above descriptions certainly serve to explain Ms. Davall's actions in this matter. Too, the severity of these diagnosis and

the fact that they are repeatedly found by various professionals over a period of time in excess of a decade would lead one to conclude that they are severe in nature and worthy of consideration. They certainly cause one to consider whether Ms. Davall is capable of understanding the ramifications of sentencing and, as such, under separate cover I will be requesting that the Court make a determination as to her ability to proceed with the sentencing proceedings.

Additionally however, and given the goals imposed by 18 U.S.C. §3553, the Court is asked to consider whether treatment under these circumstances might be preferable to an extended period of incarceration. As inevitably the defendant will be restored to society, it would seem to be in the public interest to have her restored in a normal, healthy state.

### b. Physical Condition, Including Drug or Alcohol Dependence or Abuse

Ms. Davall has two separate physical conditions which beg the attention of the Court. As earlier noted by Judge Baxter, Ms. Davall is HIV positive. In this regard, it requires little imagination to conclude that she was very likely infected during the activities that led to her arrest. Moreover, the severity of this disease is certainly a punishment in itself. As Ms. Davall's life has, very literally, been placed in jeopardy by her own criminal conduct, it is hoped that it will be considered a factor in granting a lesser sentence.

Additionally, Ms. Davall is addicted to drugs. While this is not normally considered a basis for departure, it does serve to explain her actions in obeying the orders of Edward Tilden to ML's detriment. It is hoped that the Court will make allowances for drug treatment so that Ms. Davall may have some hope of returning to society in a sober and productive state.

## IV. DEFENDANT'S SENTENCING REQUEST

Recognizing the obligation of the Court to consider the United States Sentencing Guidelines as interpreted by *Booker,* it is once again noted that the Court has wide latitude in formulating an appropriate punishment. United States v. Booker, 543 U.S. 220 (2005). In this regard, the Court's attention is respectfully directed to the fact that the defendant was convicted, upon her extremely early confession and plea. Furthermore, Ms. Davall's role in the matter at bar was, without doubt, a minor one. She was essentially a prostitute whose job was expanded to include the care and supervision of an underage woman. In this role, Ms. Davall suffered alongside the victim in this matter, received beatings and was caused to have sex with strangers. Surely then, hers was not a happy or profitable existence either.

Therefore, the Court is respectfully requested to impose the minimum sentence of 10 years along with the request that she be incarcerated as close to her family as possible. A sentence imposed in accordance with the above

recommendations would be, in this writer's opinion, "sufficient but, not greater than necessary" to achieve the goals of sentencing as well as consistent with the interests of justice.

Dated: February 9, 2015                    Respectfully submitted,


                                           Jeffrey R. Parry, Esq.
                                           Attorney for Defendant Alexandria Davall
                                           Bar Roll No. 508023

# EXHIBIT 1

GENL-4 (REV. 01/05)

SUPPORTING DEPOSITION (CPL §100.20)                                    NEW YORK STATE POL

STATE OF NEW YORK                                    COUNTY OF      ONEIDA
LOCAL CRIMINAL _____ COURT                 CITY      of   UTICA

THE PEOPLE OF THE STATE OF NEW YORK      )
                                         )           SUPPORTING DEPOSITION
                -vs-                      )
                                         )           LEAD #
_____          )           CASE #
                                         )
                    (Defendants(s)       )

STATE OF NEW YORK                        )
COUNTY OF    ONONDAGA                     )
                                         )           ss.
TOWN      of  ▓▓▓▓▓▓▓▓▓▓                  )

On  DATE 02/24/12  at  TIME STARTED 08:45a.m.  I,  FULL NAME  M▓▓▓▓▓▓

DATE OF BIRTH ▓▓▓▓   NO. & STREET ▓▓▓▓▓▓▓   CITY ▓▓▓▓▓   STATE ▓▓▓▓▓

State the following:

I am at▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ talking to Investigator Todd Grant of the New York State Poli
I am talking to Todd about things that I have done and things that have happened to me over the last month. I have
been drug free for one week and I completely understand everything that is happening today. I am a good student wl
I want to be and my grades are usual in the 80's and 90's when I go to school. I can read and write well.

My name is M▓▓▓▓ L▓▓▓▓ and I am 16 years old. I was born on ▓▓▓▓▓▓▓ I grew up in ▓▓▓ and in ▓▓
▓▓▓ I did attend ▓▓▓▓▓▓▓▓ but I got kicked out because of problems with the principle. My mothers name
▓▓▓▓▓ and she lives at ▓▓▓▓▓▓▓▓▓ My fathers name is ▓▓▓▓▓▓ but I do not know
where he lives. I have had a rough childhood as I have been bounced around between my mother and father. I have
also been in trouble with the police and school since I have been about 12 years old. I have three sisters none of whic
live with my mother and I. My address now is ▓▓▓▓▓▓▓▓▓ and I plan on living with my mother when I get ou
of here.

I am talking to Todd today because I really want to turn my life around. Todd has explained to me the importance of
telling the whole truth and not telling any lies. Everything that I have said today is the truth and nothing but the truth.

NOTICE
(Penal Law §210.45)

xml

In a written instrument, any person who knowingly makes false statement which such person does not believe to be true has committed
a crime under the laws of the state of New York punishable as a Class A Misdemeanor.

Affirmed under penalty of perjury                     x M▓▓▓▓▓▓▓▓ L
this 24th day of February, 2012.                     (SIGNATURE OF DEPONE
            -OR-
*Subscribed and Sworn to before me                              (WITNESS)
this ____ day of _____, 20 __.                                                    TIME ENDED

* This form need be sworn to only when specifically required by the court.     Inv. Todd F. Grant          12:30p.m.
                                                      Inv. ▓▓▓▓▓▓

Header Will Update When Printed

GENL 61A (REV. 01/05)          SUPPORTING DEPOSITION CONTINUATION SHEET          PAGE 2 of 2

PEOPLE vs.                                                                      LEAD#
                                                                               CASE#



Around one month ago I went AWOL from ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. I had been there for about 3 month
and I was sick and tired of being there. I was sent to ▓▓▓▓▓▓ because I had run away from the ▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓ I was at these places because I kept on getting into trouble at school and at home. Around a mor
ago I ran away from ▓▓▓▓ with two other girls. These girls ended up leaving me in Poughkeepsie, NY. When I
say that they left me they just ditched me by myself and left. I had never been to Poughkeepsie before so I was scar
and all alone. I ended up going to this building like a church that had a bunch of church people there. I told them th
my friends had left me and that I was from ▓▓▓▓ The church people gave me a bunch of money and bought me a
ticket to Utica. I took a bus from Poughkeepsie to Utica and I arrived in Utica around 2:00 am on a Friday night. I a
not one hundred percent sure but I believe that it was Friday February 3rd, 2012. I arrived in Utica at the bus station
around 2:00 am and I had no place to go. I started walking away from the buses and a black man who said that his
name was "Big" asked me if I needed a ride. I told him that I did not have any money and he said the ride would be
free. I got into the cab and told him my story. When I say my story I mean that I told him that I had ran away from
detention center in Albany and that I was 17 years old. I told him I did not have anyplace to go and no one to call or
phone. "Big" drove me around Utica and started to call people on his cell phone. I heard him say that he had "fresh
meat" to someone. "Big" got off the phone after he told the person he had fresh meat and he told me that he wanted
to meet a friend of his named "Lexi." "Big" drove to the projects in Utica. When I say projects I mean the projects
near MVCC. We picked up "Lexi" and we drove around. "Lexi" told me about herself and told me that I could stay
with her if I needed a place to stay. "Big" drove us to an apartment where a guy named Charles lived. "Big" droppe
us off and left. Before "Big" left he gave me a cell phone and told me that I could have it. He gave me his number a
said to call him if I needed anything. His cell number is ▓▓▓▓▓▓▓▓ When we went into the apartment Charles was
watching porn on TV and gathering up weed and crack on top of his TV. Charles said that he wanted to have a three
some with "Lexi" and I but I said no. "Lexi" and Charles started smoking crack and "Lexi" offered some crack to m
but I told her no. Charles gave me some weed and I smoked it. "Lexi" and Charles started having sex and I went int
the other room until they were done. "Lexi" and I then walked back to her house at 308 Nichols Street Utica, NY.
When got there "Lexi" and I just talked and watched some movies. At this point "Lexi" seemed like a big sister and
someone that just wanted to take care of me. Saturday February 4th, 2012 we woke up and were just hanging out.
"Lexi" started calling people and telling them that she had fresh meat at her house. I was mad about this but I never
said anything to her. On Saturday "Lexi" told me that she was a prostitute. She told me that she had been doing it fo
years and made a lot of money. She said she could make stacks of money in a day. She was telling me that I should
it so I could make good money. She said with the people that she knows I could make a lot. I told her that I was only
16 years old and I was not interested in doing that kind of stuff. The rest of Saturday we spent just hanging out and s.
kept trying to convince me to be a prostitute like her. On Sunday February 5th, 2012 the Utica Police Department can
and picked me up from her house. "Lexi" had a friend that came over that had Facebook on her phone. I logged into
my account, which is ▓▓▓▓▓▓▓▓▓▓▓▓ and I sent my friend Richie a message telling him where I was. My
mother had hacked my account and was watching for messages that I was sending. When she saw this message she
called the police. The police took me to the police department and two people from ▓▓▓▓▓▓▓▓▓▓ came to pick
me up and bring me back. On Monday February 6th, 2012 I ran away from ▓▓▓▓▓▓▓▓▓ again. I ended up at a gas station
in ▓▓▓▓▓ I still had the phone that "Big" had given to me but it did not have any minutes on it. I met an old black
guy who said he was a church going guy. I told him that I was lost and my friends had ditched me. The guys actually
gave me a ride from ▓▓▓▓ to Utica just because he was a nice guy. I arrived in Utica and I had the guy drop me off
the Projects. I had called "Lexi" from ▓▓▓▓ and told her that I ran away again. She told me to call her once I was i
Utica. I called her and got a ride over to her house.

On Monday February 6th, 2012 I got to "Lexi's" house around 11 pm. She started right back up and telling me that I
needed to go on dates for money. She told me that if I was going to stay at her place I would need to give her money f
food and stuff and that being a prostitute was a good way to make good money.

Header Will Update When Printed

SUPPORTING DEPOSITION CONTINUATION SHEET                    PAGE 3 of 3

GENL 61A (REV. 01/05)

PEOPLE vs.

LEAD#
CASE#

On Tuesday February 7th, 2012 I met a guy named Eddie.  "Lexi" told me that Eddie was the one who set up all the dates.  She said that he had guy's numbers on his phone and would set up the dates for her.  "Lexi" told me that I needed to go on dates for money so I could stay at her house.  I finally told "Lexi" that I would give it a try because I pressured me into doing this.  Eddie sent a text message to all of his people that said "2 girl special 1 fresh meat 1 has been doing it for a while."  "Lexi" told me a bunch of rules to follow when going on dates.  She told me to always get the money up front, always ask if the dates are the police, and always be very careful.  She told me to tell my dates that my name was Kayla and that I was 18 years old.  She told me never to use my real name.  "Lexi" said that she uses her real name but that I should not.

On Wednesday February 8th, 2012 Eddie told me that I had my first date.  "Lexi" had a date as well and she got all dressed up.  I just stayed in my sweat pants because I was very scared and nervous.  An old guy named "Dave" came to "Lexi's" house and picked me up.  He drove me to the Red Roof Inn in Utica and he parked out in the back.  I was so nervous that all I did was use my hand to jerk him off a little bit.  I did not even finish because I asked him if I could stop because I was scared.  He said I could and he gave me $52 dollars.  He drove me back to "Lexi's" house and dropped me off.  When I got inside "Lexi" asked me for the money so that she could buy crack.  "Lexi" told me that I should do some crack to calm myself down and make it easier to go on dates.  When her dealer came over she set me up with a crack pipe and put a small rock in it.  She had me smoke a little bit of crack and I ended up getting sick.  I kept on thinking to myself that I should not be doing this.  I just ended up going to bed.

On Thursday February 9th, 2012 Eddie told me that I had another date.  He said that he had sent out a text to his people saying : two girl specials.  "Lexi" told me that our date was at 11 pm and she said that I should smoke some more crack to make the date easier.  "Lexi" gave me a crack pipe with some crack in it and I smoked a bunch.  A guy she knows named "D" picked us up and drove us to an apartment on the outskirts of Utica.  The building was #28 and the Apartment was C.  The guys was in a wheel chair and he gave us $160 dollars to let him eat us out.  When I say eat us out I mean that we laid down on his bed and he laid between our legs and put his tongue inside our vaginas.  This guy gave "Lexi" the money and she only gave me $60 dollars.  The whole time that we were inside the apartment "D" waited for us outside.  "D" drove us back to her house and "Lexi" told me to give him $10 dollars for gas.

On Friday February 10th, 2012 "Lexi" told us that she was having surgery and going to her mother's house for the weekend.  "Lexi" had told me that she was HIV positive the first day that I met her.  She told me that she was allergic to latex condoms and needed to use special condoms.  I believe that she was having surgery for something related to having HIV.  A guy named Mike, Eddie and I walked to a girls house.  This girl's name was "La".  "La" lives on Webster Street in Utica and she lives with an older guy named Kurt.  "La" told me that her and I were going to have dates that she was going to set up.  She took me into her living room and gave me sexy clothes to wear.  She had me pose in sexual positions and took pictures of me on her IPhone.  She told me she was going to post my pictures up on an Internet Site called Backpage.  She took pictures of my boobs and butt but while I was wearing sexy clothes.  She said that I was going to use the name "Summer."  After this we all went to the Super 8 in Utica and "La" got a hotel room.  She paid for the room and put it in her name.  While we were at the hotel she was shooting some kind of drug in the veins on her hand.  She told me that I should do it because it would make our dates go a lot easier.  I told her that I did not want to do any drugs like that.  She grabbed my arm and told me to look the other way.  I felt a pinch and saw that she had shot me up with the needle.  I was really mad and really scared of what was going to happen.  She told me that everything was going to be alright.  I asked her what the drug was and she told me it was heroin but better.  About 10 minutes after I started feeling very sleepy and I was in a daze.  Later on in the night "La" told me that we had a date I was still out of it but I remember that Kurt came to the Super 8 and picked "La" and I up.  He drove us to an apartment in Utica.  I told "La" that I could not go on the date because I had gotten my period.  She told me to take a baby wipe and roll it up and shove it into my pussy.  I told her no way.

Header Will Update When Printed

GENE 61A (REV. 01/05)                SUPPORTING DEPOSITION CONTINUATION SHEET            PAGE 4 of 4

PEOPLE vs.                                                                              LEAD#
                                                                                        CASE#

When we got into the apartment there were two guys that I think were in their 20's. I was very out of it and very shy and the one guy said he wanted the shy one. We were all in the same room and I gave a blow job to the one guy. "I had sex with the other guy and they gave her $160 dollars for us both. "La" gave me $60 dollars and we left. Kurt waited for us and when we got into the car "La" told me that I had to have sex with Kurt to pay for my share of the hotel room. I was out of it but I told him know way. I told him that he was old enough to be my grandfather and I would not do that. "La" was telling me that there would be a lot of guys that were a lot older that I would be having sex with and that I should get used to it. We went back to the hotel room and I refused to have sex with him so he ju left.

On Saturday February 11, 2012 we changed hotels and "La" got us a room at the Red Roof Inn in Utica. Nothing really happened as far as going on dates but during the night I had sex with Eddie. When I say sex I mean that Eddie put his penis into my vagina.

I want to add that "La" never stayed at the hotel with me on either night. She just paid for the room and put it in her name.

On Sunday February 12th, 2012 Eddie told me that I had a date with Dave. Dave picked me up at the Taco Bell in Utica and drove me to his house in New York Mills. He gave me $160 dollars and I gave him a blowjob in his house I had him drop me back off at the Taco Bell and I got a ride over to "Lexi's" house.

At this point I had started smoking crack more often and I do not remember much. I do know that had an orgy with Eddie, "Lexi", and Mike. I only ended up having sex with Mike but we all had sex in the same room.

On Friday February 17th, the Utica Police came and picked me up at 'Lexi's" house.

The following is a list of the people that I mentioned above. I am giving their descriptions as best as I can.

"Lexi" : I know her real first name is Alexandra and her last name starts with a D. She lives in the bottom half of a house at 308 Nicholes Street Utica, NY. The house is brick and is brown. Lexi is white female around 23 years old with brown hair and brown eyes. She has a lot of tattoos and piercing. I know she has fairy tattoos on her legs. She has 2 nose, 2 eyebrow and 2 tongue piercings.

"La" : La is Eddies sister. She is a white female around 25 years old. She has black hair and blue eyes. She is heav set and always wears heals. She lives with Kurt on Webster Street in Utica, NY. The inside of her place has 3 rooms and a bathroom. One computer room and two bedrooms. She has a big flat screen TV, the couch is black and a rocking chair. She has a little brown table and family pictures all over the place. She has a dog a the kitchen has a mirror hanging above the sink. She told me that she has sex with Kurt for car rides. She tol me that she prostitutes everywhere. She says that Kurt will drive her to Canada, Buffalo, Pennsylvania, and Florida just for dates.

"Kurt":Kurt is a older white man and always has a cigar and cowboy boots. He has white hair and he is medium size and medium height. Kurt drives a redish truck like car.

"Eddie": Eddie is a white man and is 29 years old. He has blue eyes and brown hair. He is chubby and maybe like 5 foot 7 inches. Both ears pierced and he has a dog tag tattoo on the back of his nec



Header Will Update When Printed

GENL 61A (REV. 01/03)          SUPPORTING DEPOSITION CONTINUATION SHEET          PAGE 5 of 5

PEOPLE vs.

LEAD#
CASE#

"Mike": Mike also goes by "Ready Rock" because he is a crack dealer. He is a black male in his 30's. He has a tatt
on his left hand near the web between his thumb and finger. He is tall and has a medium build.

"Mike": This is the Mike that I had sex with and may be pregnant by. He is tall and
    skinny. He has brown hair and blue eyes.

"D" : D Is a black short skinny male. D is in his 20's. D drives a black car with tinted
    windows.

"Big" : Big is a tall black man heavy set. He wears glasses and has a deep voice. He
    drives cab 69. The only days he does not work is Thursday and Friday. Big says that he has a wife and 3 kic

"Dave" : Dave was my first date. Dave said that he is the manager at the Walmart in
    Utica. Dave is a white male in late 40's or early 50's. He is balding on top and has a white mustache. He
    drives a 4 door tan car that is nice.

    I want to say that I really don't want anything to happen to Mike. I may be pregnant with his child and I wou
refuse to have him arrested or cooperate with the police to have him prosecuted. I had sex with him and I wanted to.
feel that "Lexi" and "La" should go to jail for forcing me into prostitution. They both pimped me out and made me [
them money to stay at the house and the hotel. They both forced me to use drugs and then once I was drugged they
made me have sex with men. They took most of the money and I felt trapped. When I started they made me feel like
owed them money for staying at the house and after they got me hooked on drugs they made me have sex with men t
get more drugs. I don't know what the set up is but I know that Eddie is the one that set up a lot of the dates and the
girls are the ones that gave me drugs and made me have sex.

    Everything that I have said in this statement is the truth. Todd has told me that it is a crime to lie in a written
statement. I am doing this so that other girls in my situation wont have to go through the same thing. I feel that they
took advantage of me because I felt like I had no where else to turn. In reality I know now that my mother loves me
and lots of people care about me and my life is headed in the right direction.

